IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

GEORGE W. HARDY,                    *
                                    *
        Plaintiff,                  *
                                    *
        v.                          *        CV 117-172
                                    *
GEORGIA DEPARTMENT OF               *
CORRECTIONS, et al.,                *
                                    *
        Defendants.                 *
                                    *

_____

**O R D E R**

_____

Presently before the Court is Defendants Kimberly Fountain, M.D.; Shante Wells, R.N.; Elizabeth West; Linda Giddens, R.N.; Warden Stan Shepard; and Deputy Warden Betty Lee McGrew's motion for summary judgment.  (Doc. 77.)  For the following reasons, Defendants' motion is **GRANTED IN PART** and **DENIED IN PART**.

## I. BACKGROUND

Plaintiff's Second Amended Complaint (the "Complaint") alleges federal and state causes of action for conduct that occurred in June and July of 2015.[1]  (See Compl., Doc. 42.) Plaintiff is an inmate confined at the Georgia Diagnostic and Classification Prison ("GDCP") in Jackson, Georgia, and was held

_____

[1] Defendants are not seeking summary judgment on Plaintiff's state law claims. (See Doc. 77-1, at 1 n.1.)

at GDCP at all times except as otherwise stated. (Id. at 6.) Plaintiff has an extensive history of arterial disease, diabetes, and high blood pressure, and underwent several cardiovascular procedures between 2011 and 2014. (Hardy Dep., Doc. 77-11, at 22-23.) Plaintiff also has a history of diabetic neuropathy, which causes neuropathic pain and numbness in his lower extremities.[2] (Burnside Decl., Doc. 77-9, ¶ 7.) He was regularly administered Neurontin, a prescription nerve pain medication, to assist with his symptoms. (Id.; Hardy Dep., at 51.) Plaintiff was also prescribed Plavix, an anti-coagulant. (Hardy Dep., at 22-24.)

In May 2015, Plaintiff was scheduled to undergo salivary gland surgery. (Burnside Decl., ¶ 8; Gore Dep., Doc. 79-6, at 16.) In anticipation of the surgery, Dr. Edward Hale Burnside discontinued Plaintiff's Plavix prescription to lower his risk of excessive bleeding. (Hardy Dep., at 24-25; Sampson Decl., Doc. 77-10, ¶ 3; Burnside Decl., ¶ 8-9.) On June 25, 2015, Plaintiff was transported to Augusta State Medical Prison ("ASMP") in preparation for his surgery. (ASMP Medical Records, Doc. 77-4, at 8.)[3] During Plaintiff's time at ASMP, numerous members of the ASMP medical staff cared for him. When he first arrived at ASMP, Nurse

---

[2] The Parties dispute whether Plaintiff complained of symptoms of neuropathy during the time of Defendants' alleged deliberate indifference. (See Doc. 79, at 3; Doc. 82, at 3.)

[3] Defendants attach Plaintiff's medical records to Nurse Giddens' Declaration. (See Doc. 77-4.) To avoid confusion, the Court refers to pages 1-6 as "Giddens Declaration" and pages 7-35 as "ASMP Medical Records."

Giddens and Dr. Fountain recorded admission notes.[4] (See Fountain Decl., Doc. 77-3, ¶ 7; ASMP Medical Records, at 8.)   On June 29, 2015, Plaintiff was transported to the Georgia Regents University Medical Center for salivary gland surgery and returned to ASMP the same day.   (ASMP Medical Records, at 11-12.)   Plaintiff was prescribed morphine elixir and Percocet for his pain following surgery.  (Fountain Decl., ¶ 7; Giddens Decl., ¶ 6.)

Plaintiff first complained of pain in his right foot on July 9, 2015. (Giddens Dep., Doc. 79-5, at 26-27; ASMP Medical Records, at 20.)   Plaintiff's complaints of pain continued until July 22, 2015, when he was transported back to GDCP.  (ASMP Medical Records, at 33.)  The specific dates that Plaintiff complained of pain while at ASMP, and who he complained to, are not clear because his medical records are not always legible, and Plaintiff avers that portions of his medical records are not reliable.  (See Doc. 82, at 8-11.)   Moreover, Plaintiff does not remember any specific encounter that he complained of pain but instead stated he told "Dr. Fountain and probably every nurse that came in there." (Hardy Dep., at 32, 34.)   The Court attempts to summarize Plaintiff's treatment below.

---

[4] The admission notes are difficult to read.   (See Fountain Decl., at 7.) However, Nurse Giddens clearly notes that Plaintiff complained of numbness and tingling in his lower extremities. (ASMP Medical Records, at 8.)  Despite this record, Plaintiff disputes he ever complained of numbness and tingling upon admission to ASMP.  (See Doc. 79, at 3.)

According to the medical records, on July 9, 2015, Nurse Giddens noted that Plaintiff complained of pain in the left side of his jaw and right foot. (ASMP Medical Records, at 20-21.) She also noted Plaintiff had no open areas or redness on his right foot and that Dr. Fountain was aware of Plaintiff's complaints. (Id.) Plaintiff was given Percocet and a warm compress for his foot, which Plaintiff reported "helped a lot." (Id. at 21.)

Plaintiff did not complain of foot pain again until July 11, 2015. (Id. at 23.) In response, he was given Percocet and a warm compress. (Id.) The same occurred on July 12, 2015. (Id. at 24.) However, the medical records note that Plaintiff stated the pain medicine was very effective. (Id.) On July 13, 2015, Plaintiff complained of foot and leg pain, and again received Percocet and warm compresses multiple times throughout the day. (Id.) On July 14, 2015, a nurse noted Plaintiff was ambulating in his room and able to move all of his extremities. (Id. at 25.) Plaintiff complained of foot pain in the morning and was given Percocet and a warm compress. (Id. at 26.) Later the same day, he complained of foot pain and jaw pain and was given another dose of Percocet. (Id.) Similar notes were recorded on July 15, 2015. (Id. at 27.)

On July 16, 2015, Plaintiff complained of pain and numbness in his right foot. (Id.; Powell Dep., Doc. 79-7, at 49.) On July 17, 2015, Plaintiff's medical records note that he was up in his

4

room and ambulating and had complaints of jaw pain or foot/ leg pain. (ASMP Medical Records, at 29.) Plaintiff was given Percocet. (Id.) On July 18, 2015 Plaintiff complained of pain in his feet, legs, and left jaw area.[5] (Id. at 30.) However, Plaintiff was ambulating around his room. (Id.) Later the same day, Plaintiff also complained of chest pain and numbness in his right leg. (Id.) Security was called and Plaintiff's vitals were taken. (Id.) He was offered a "GI cocktail," but Plaintiff refused it and asked the "PA" to come assess him. (Id.) However, the PA refused to see Plaintiff.[6] (Id.)

On July 19, 2015, Plaintiff complained of right foot, leg, and hip pain. (Id. at 30.) Nurse Giddens noted Plaintiff was up and ambulating in his room. (Id.) She also examined his foot and found that no breakdown, bruising, or edema was present, and recorded his pulses.[7] (Id.) She also notified Dr. Fountain of Plaintiff's complaints and received no new orders from her. (Id.) Plaintiff received Percocet for his left jaw and right lower extremity pain and it is noted that he obtained relief. (Id. at 31.)

---

[5] Although the records do not specify that Plaintiff was complaining of pain in his right foot and leg only, Plaintiff never specifically complains of pain on his left side.
[6] The Parties never discuss who the "PA" is that refused to assess Plaintiff.
[7] Plaintiff questions if this encounter ever occurred because Dr. Bauer, Plaintiff's expert, opines that Nurse Giddens' pulse examination was improperly recorded. (See Doc. 82, at 9; Bauer Dep., Doc. 79-9, at 54-55.)

Plaintiff complained of right foot pain again on July 20, 2015. (Id. at 34.) On July 21, 2015, Plaintiff asked the nurse on duty to "call the PA for some motrin" and stated his leg "really hurts." (Id.) The nurse noted he was to follow up with Dr. Fountain the next morning. (Id.) Later the same day, Plaintiff was observed ambulating in his room and standing at his door. (Id. at 33.) He was given a warm compress for his leg. (Id.)

Plaintiff also complained of pain on July 22, 2015 and was given Percocet. (Id.) The medical records also note that Plaintiff was standing at his door. (Id.) Plaintiff was transported back to GDCP the same day. (Id.; Burnside Decl., ¶ 11.) At the time of Plaintiff's release, Plaintiff asserts he needed assistance boarding the transport van and was in a wheelchair. (Hardy Dep., at 42, 46-48.) Plaintiff also asserts that at this point, his leg was dark, swollen, and emanated an odor. (Id. at 96-99.)

The next day, Plaintiff was examined by either Nurse Mary Gore or Dr. Burnside.[8] (Burnside Dep., Doc. 79-2, at 73-74.) The consultation notes indicate Plaintiff complained of "feet becoming very numb, painful, heavy, cold." (Id. at 73.) The notes also state Plaintiff had a good pulse in his feet, they were warm, and he had decreased sensation. (Id.) Dr. Burnside stated Plaintiff

---

[8] It is not clear from the "Medical Consultation" form who first examined Plaintiff when he arrived at GDCP. (See Burnside Dep., at 73.) However, Dr. Burnside remembers evaluating him. (Id. at 25-28.)

6

was able to wiggle his toes, "one foot looked like the other," and he did not notice any odor. (Id. at 26.) Dr. Burnside then ordered an ultrasound and doppler which revealed Plaintiff had blockages in his arterial stents, reducing the blood flow to his leg and foot.[9] (Id. at 77-80.) Plaintiff was admitted to the Atlanta Medical Center on July 24, 2015 for an evaluation by a vascular surgeon. (Burnside Decl., ¶ 14.) The surgical team attempted to restore blood flow to Plaintiff's right leg but failed. (Id.) Plaintiff's leg became non-viable and he underwent an above-the-knee amputation on July 31, 2015. (Id.)

## II. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Facts are "material" if they could "affect the outcome of the suit under the governing [substantive] law," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and a dispute is genuine "if the non[-]moving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." Waddell v. Valley Forge Dental Assocs., Inc., 276 F.3d 1275, 1279 (11th Cir. 2001). The Court

---

[9] "Ischemia is a 'deficiency of blood in a part, usually due to functional constriction or actual obstruction of a blood vessel.'" Werner v. Ace USA, No. 1:07-CV-0932, 2008 WL 2917607, at *3 n.1 (N.D. Ga. July 28, 2008) (quoting Dorland's Illustrated Medical Dictionary 954 (30th ed. 2003)).

must view factual disputes in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must "draw all justifiable inferences in [the non-moving party's] favor." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (citation, internal quotation marks, and internal punctuation omitted). The Court may not weigh the evidence or determine credibility. Anderson, 477 U.S. at 255.

The moving party has the initial burden of showing the Court the basis for its motion by reference to materials in the record. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the non-movant bears the burden of proof at trial, as Plaintiff does here, the movant has two options as to how it can carry its initial burden. Id. at 1115-16. The movant may demonstrate an absence of evidence to support the nonmovant's case, or provide affirmative evidence demonstrating the nonmovant's inability to prove its case at trial. Id.

If the movant carries its initial burden, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." Id. The non-movant must tailor its response to the method by which the movant carries its initial burden. For example, if the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial

on the material fact sought to be negated." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993). On the other hand, if the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1116-17. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

In this action, the Clerk of Court provided all parties notice of the motion for summary judgment, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. 78.) For that reason, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985), have been satisfied. The time for filing materials in opposition has expired, the issues have been thoroughly briefed, and the motion is now ripe for consideration.

## III. DISCUSSION

Plaintiff brings claims for deliberate indifference to a serious medical need, as protected by the Eighth Amendment of the

United States Constitution, against Defendants under 42 U.S.C. § 1983. Defendants move for summary judgment on two grounds. First, Defendants argue Plaintiff's claims fail as a matter of law. In the alternative, they argue they are entitled to qualified immunity.

## A. Deliberate Indifference to a Serious Medical Need

### 1. Legal Standard

Deliberate indifference to the serious medical need of a prisoner is proscribed by the Eighth Amendment's prohibition of unnecessary and wanton infliction of pain. Harris v. Leder, 519 F. App'x 590, 595 (11th Cir. 2013) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)). To prove a claim of deliberate indifference, "a plaintiff must show: (1) a serious medical need; (2) a defendant's deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." Melton v. Abston, 841 F.3d 1207, 1220 (11th Cir. 2016) (citing Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1306 (11th Cir. 2009)).

Whether a medical need is sufficiently serious is an objective inquiry. See Goebert v. Lee Cnty., 510 F.3d 1312, 1326 (11th Cir. 2007). "A serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Mann, 588 F.3d at 1307 (quoting Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994),

10

overruled in part on other grounds by Hope v. Pelzer, 536 U.S. 730, 739 (2002)).   The Court is satisfied that Plaintiff had a serious medical need, and Defendants do not seem to argue otherwise.   See Walsh v. Jeff Davis Cnty., No. CV 210-075, 2012 WL 12952564, at *7 (S.D. Ga. Mar. 29, 2012), aff'd, 489 F. App'x 389 (11th Cir. 2012) ("[I]t is beyond question that reduced blood flow in a diabetic which is severe enough to cause a leg amputation is a serious medical need.").

Next, Plaintiff must show Defendants were deliberately indifferent to his serious medical need, which is a subjective inquiry.   See Goebert, 510 F.3d at 1326-27.   To satisfy this burden he "must prove: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence."   Melton, 841 F.3d at 1223 (citations omitted). "Whether a particular defendant has subjective knowledge of the risk of serious harm is a question of fact 'subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'"   Goebert, 510 F.3d at 1327 (quoting Farmer v. Brennan, 511 U.S. 825, 842 (1994)).   "Disregard of the risk is also a question of fact that can be shown by standard methods." Id. (citing Farmer, 511 U.S. at 846).

"The meaning of 'more than [mere] negligence' is not self-evident[;]" however, in the Eleventh Circuit, "[c]onduct that is more than mere negligence includes: (1) grossly inadequate care; (2) a decision to take an easier but less efficacious course of treatment; and (3) medical care that is so cursory as to amount to no treatment at all." Id. (citation omitted); Bingham v. Thomas, 654 F.3d 1171, 1176 (11th Cir. 2011) (citing Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004)). Additionally, "[a] defendant who unreasonably fails to respond or refuses to treat an inmate's need for medical care or one who delays necessary treatment without explanation or for non-medical reasons may also exhibit deliberate indifference." Melton, 841 F.3d at 1223 (citations omitted).

However, "an official's failure to alleviate a significant risk that he should have perceived but did not" does not constitute deliberate indifference. Farmer, 511 U.S. at 838. Nor does "accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law." Bingham, 654 F.3d at 1176 (citation omitted); see also Ruiz v. Rummel, 777 F. App'x 410, 415 (11th Cir. 2019) ("[A] doctor's failure to accurately diagnose a prisoner's condition, even if extremely negligent, did not 'cross the line to deliberate indifference.'" (quoting McElligott v. Foley, 182 F.3d 1248, 1256 (11th Cir. 1999))).

Further, "[i]n considering a deliberate indifference claim, 'each individual Defendant must be judged separately and on the basis of what that person knows.'" Melton, 841 F.3d at 1224 (quoting Burnette v. Taylor, 533 F.3d 1325, 1331 (11th Cir. 2008)). For that reason, "imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference." Presley v. City of Blackshear, 650 F. Supp. 2d 1307, 1315 (S.D. Ga. 2008) (quoting Burnette, 533 F.3d at 1331).

"The final requirement for a deliberate indifference claim is that a defendant have a causal connection to the constitutional harm." Goebert, 510 F.3d at 1327 (citing Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003), abrogated in part on other grounds by Randall v. Scott, 610 F.3d 701 (11th Cir. 2010)). Causation "can be shown by personal participation in the constitutional violation." Id. (citing Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986) (per curiam)).

2. Analysis

Plaintiff brings claims of deliberate indifference against Dr. Fountain, Nurse Giddens, Nurse Wells, Ms. West, Warden Shepard, and Deputy Warden McGrew for their direct participation in his medical treatment, and also against Dr. Fountain, Warden Shepard, and Deputy Warden McGrew in their roles as supervisors.

13

a. *Individual Liability*

i.  Dr. Fountain

Plaintiff avers Dr. Fountain was deliberately indifferent to his medical needs by: (1) failing to "furnish Plaintiff with anti-coagulant prophylaxis within a reasonable time following his [salivary gland] surgery[;]" and (2) failing to provide "additional medical or diagnostic care in response to Plaintiff's ongoing symptoms" or "consult with any additional medical care providers." (Compl., at 7-8.)  Plaintiff has shown he had a serious medical need; therefore, the Court turns to whether Dr. Fountain "had subjective knowledge of the fact that [Plaintiff] was at substantial risk of suffering a serious harm" and disregarded that risk. Brooks v. Wilkinson Cnty., 393 F. Supp. 3d 1147, 1163 (M.D. Ga. 2019).

First, Plaintiff's medical records indicate Dr. Fountain entered a physician's order to renew Plaintiff's Plavix prescription beginning on June 30, 2015. (Fountain Decl., at 20.) Although Dr. Fountain asserts the medical records reflect Plavix was administered on July 1-22, 2015, Plaintiff's "medical administration records" only reflect that Plavix was administered on July 15-22, 2015. (See id. at 23.)

Despite what the medical records reflect, Plaintiff asserts he does not remember receiving Plavix until he returned to GDCP. (Hardy Dep., at 28, 30.)  Additionally, he argues "[w]hile [Dr.

14

Fountain] may aver that she ordered that Plaintiff be administered Plavix, she cannot say for certain that the drug was actually administered." (Doc. 79, at 11.) Further, he argues, without citing to any authority, since "Defendant Fountain did not personally prepare the [medical record] or observe Plaintiff take any Plavix, it is for a trier of fact to determine the reliability of such documentation." (Id.) However, the issue here is not whether Plaintiff actually received his medication; it is whether Dr. Fountain was deliberately indifferent to his serious medical need. The fact that Dr. Fountain prescribed the medication itself shows she was not deliberately indifferent. Plaintiff has produced no evidence that his medical records showing the administration of Plavix are false or that Dr. Fountain purposely withheld his medication or had knowledge that he was not receiving it. Thus, Dr. Fountain was not deliberately indifferent as to Plaintiff's Plavix prescription.

Now the Court turns to Dr. Fountain's treatment, or lack thereof, of Plaintiff's serious medical need. "[W]hen a prison inmate has received medical care, courts hesitate to find a[n] Eighth Amendment violation." McElligott, 182 F.3d at 1259 (quoting Waldrop v. Evans, 871 F.2d 1030, 1035 (11th Cir. 1989)). Here, Plaintiff received medical treatment. However, he argues that Dr. Fountain was deliberately indifferent to his medical needs because she never examined his foot, referred him to a specialist, or tried

to determine the cause of his pain, despite his ongoing complaints. (Doc. 79, at 12-14.)   Plaintiff asserts Dr. Fountain "knew that [he] ran a high risk of developing ischemia, but consciously chose to disregard that risk."   (Id. at 13.)

To the extent Plaintiff argues that Dr. Fountain and his care providers were deliberately indifferent to his medical needs solely because they failed to conduct a CT scan, x-ray, or doppler scan on his limb, the Court finds this is not an appropriate basis for liability.

> The United States Supreme Court has held that . . . [t]he question whether an x-ray – or additional diagnostic techniques or forms of treatment – is indicated is a classic example of a matter for medical judgment.   A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment.   At most it is medical malpractice, and as such the proper forum is the state court[.]

Dunn v. Hart, No. 5:13-CV-131, 2016 WL 5661058, at *6 (S.D. Ga. Sept. 29, 2016) (quoting Estelle, 429 U.S. at 107).

However, the Court is satisfied that Plaintiff has provided sufficient — albeit scant — evidence from which a reasonable jury could conclude Dr. Fountain disregarded a risk of serious harm to Plaintiff by conduct that was more than mere negligence.   The evidence reflects Dr. Fountain was aware of Plaintiff's lower extremity pain.   Nurse Giddens first advised Dr. Fountain of Plaintiff's pain after his salivary gland surgery on July 9, 2015, and then again on July 19, 2015.   (ASMP Medical Records, at 20,

30.)  Additionally, Dr. Fountain asserts she had medical encounters with Plaintiff during this time.  (See Fountain Decl., ¶ 6.) However, there is no evidence that Dr. Fountain ever examined Plaintiff's foot or leg.

Although Dr. Fountain cannot be held liable for failing to diagnose Plaintiff's ischemia, she at least had a duty to investigate Plaintiff's complaints. McElligott, 182 F.3d at 1256 (finding while "failure to diagnose can be deemed extremely negligent, it does not cross the line to deliberate indifference"); Dukes v. Georgia, 428 F. Supp. 2d 1298, 1329 (N.D. Ga. 2006), aff'd sub nom., 212 F. App'x 916 (11th Cir. 2006) ("The failure to diagnose, even something as critical as colon cancer, is not deliberate indifference. Rather, deliberate indifference stems from ignoring a patient or a failure to treat.")  Dr. Fountain cannot turn a blind eye to Plaintiff's pain and then argue she had no knowledge of his serious medical need.  "[A] party that willfully blinds itself to a fact . . . can be charged with constructive knowledge of that fact." Goebert, 510 F.3d at 1328 (quoting United States v. Baxter Int'l, Inc., 345 F.3d 866, 902 (11th Cir. 2003)).

Additionally, Plaintiff asserts that in response to informing Dr. Fountain of his pain, she would tell him to "walk it off" and "you are only going to get treated for what you came here for." (Hardy Dep., at 33, 42.)  This is circumstantial evidence that Dr.

17

Fountain may have known of Plaintiff's serious medical need and disregarded it. Thus, even though Dr. Fountain "took some basic steps to alleviate [Plaintiff's] symptoms, if a jury finds that . . . [she] had subjective knowledge of the seriousness of [Plaintiff's] condition, then the medical care she provided could be characterized as either 'grossly inadequate' or 'so cursory as to amount to no treatment at all.'" Brooks, 393 F. Supp. 3d at 1164-65.

Finally, based on the evidence presented, a reasonable jury could find that Dr. Fountain's deliberate indifference was the cause of Plaintiff's injury. See Goebert, 510 F.3d at 1327 ("Causation . . . can be shown by personal participation in the constitutional violation."); Brooks, 393 F. Supp. 3d at 1165 ("[W]hether [defendant's] . . . alleged deliberate indifference caused [plaintiff's] injuries is a question for the jury.").

ii. Nurse Giddens

Plaintiff asserts Nurse Giddens was deliberately indifferent for failing "to consult with her supervisors and suggest an alternative means of treatment" despite "personally document[ing] Plaintiff's complaints of lower extremity pain" on at least four different occasions. (Doc. 79, at 14.)

Plaintiff's support for his assertion that Nurse Giddens failed to consult her "supervisor" is that during her deposition she could not recall whether she had in fact consulted Dr. Fountain

18

and that she "never documented" any such conversation. (Id.) However, Nurse Giddens explained in her deposition that "[i]f [she] had a problem with a patient, [she] would tell Dr. Fountain" and she "probably did" go to Dr. Fountain and "didn't put it in the chart." (Giddens Dep., at 41.) Additionally, on July 9, 2015, Nurse Giddens noted in Plaintiff's medical records that he complained of right foot pain and Dr. Fountain was aware of the complaints. (ASMP Medical Records, at 20.) Moreover, on July 19, 2015, Nurse Giddens noted that (1) Plaintiff was up and about ambulating in his room, (2) he complained of right hip, leg, and foot pain, (3) his right foot was examined and no breakdown was visible, (4) pedal and dorsalis pulses were noted, and (5) Dr. Fountain was notified of his complaints and gave no new orders. (Id. at 30.)

Plaintiff has not pointed to any evidence in the record to dispute that Nurse Giddens notified Dr. Fountain of his pain. Instead, it is obvious from the medical records that Dr. Fountain was made aware of Plaintiff's pain on multiple occasions and did not change his course of treatment. See Scott v. Harris, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly-contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

19

Plaintiff cannot show Nurse Giddens was deliberately indifferent by deferring to the plan of care approved of by Dr. Fountain because "[a] nurse is not deliberately indifferent when he/she reasonably follows a doctor's orders." Dunn, 2016 WL 5661058, at *7 (quoting Billue v. Gualtieri, No. 8:13-CV-546, 2013 WL 1405945, at *4 (M.D. Fla. Apr. 8, 2013)); see also Bauer v. Kramer, 424 F. App'x 917, 919 (11th Cir. 2011) ("[A] nurse is not deliberately indifferent when she reasonably follows a doctor's orders by administering prescribed medication to an inmate."). Here, the Court finds, even when viewing the evidence in a light most favorable to Plaintiff, Nurse Giddens reasonably followed Dr. Fountain's order to continue with the current plan of treatment.

Further, Nurse Giddens was one of the only Defendants that recorded her examinations of Plaintiff's foot in his medical records and she did not observe anything that concerned her. The only "symptom" Plaintiff ever expressed was pain. Although Nurse Giddens may very well "should have known" pain could be a sign of ischemia, misdiagnosis does not amount to deliberate indifference.

Thus, Plaintiff has failed to establish a genuine dispute as to whether Nurse Giddens was subjectively aware of a serious risk to his health and disregarded that risk. Nurse Giddens is entitled to summary judgment as to Plaintiff's claim for deliberate indifference.

### iii. Nurse Wells & Ms. West

Plaintiff asserts "he informed both providers at some time or another that he was experiencing leg and/ or foot pain." (Doc. 79, at 15; Hardy Decl., Doc. 79-1, ¶ 18.) Additionally, Plaintiff argues that Nurse Wells' "knowledge of his underlying conditions (as well as the risk associated therewith)" and Ms. West's "ready access to such knowledge" creates an issue of fact "whether their failure . . . to suggest to their superiors that an alternative treatment plan be pursued or that [Plaintiff] be referred to a specialist constitutes deliberate indifference." (Doc. 79, at 15.)

According to Plaintiff's medical records, Nurse Wells had seven encounters with Plaintiff at ASMP after his salivary gland surgery. (Wells Decl., Doc. 77-5, ¶ 7.) Six of the encounters occurred prior to July 9, 2015 at 9:00 A.M., which is when Plaintiff first expressed that he had pain in his right foot. (Id.) The only other encounter between Nurse Wells and Plaintiff occurred the following day, July 10, 2015. (Id.) Nurse Wells recorded in Plaintiff's medical records that he slept on and off, she measured his blood glucose, he refused his insulin dose, and that he took breakfast well. (Id.) Nurse Wells asserts Plaintiff never complained to her of foot pain, which is also supported by the medical records. Plaintiff's response to these documented encounters is that "[r]egardless of whether all his complaints

21

were documented, [he] recalls complaining of pain to Dr. Fountain and to nearly every nurse that he encountered in Section 2-A of [ASMP]." (Doc. 82, at 13.) Plaintiff cannot remember any specific encounter with Nurse Wells where he expressed his pain, he only remembers telling "Dr. Fountain and *probably* every nurse" he encountered.   (Hardy Dep., at 34.)   Plaintiff's "self-serving assertions of deliberate indifference do not create a question of fact in the face of contradictory, contemporaneously created medical records." Allen v. Rahming, 2:17-CV-25, 2019 WL 6769304, at *16 (M.D. Ala. Dec. 11, 2019) (citing Whitehead v. Burnside, 403 F. App'x 401, 403 (11th Cir. 2010)).

Plaintiff also asserts that at some point "[he] was asking her as well as the other nurses to get me some help or get somebody to do something, look at my leg." (Hardy Dep., at 18.)   The Parties dispute whether this encounter occurred.   However, even assuming Plaintiff did ask Nurse Wells to get someone to look at his leg, Plaintiff's claim against Nurse Wells fails.   First, Plaintiff has offered no evidence that he specifically asked Nurse Wells to get him help.   Instead, he vaguely asserts he was "asking her as well as the other nurses to get me some help."   (Id.) Plaintiff provides no testimony or evidence that Nurse Wells observed anything that would raise an immediate concern and thus made her aware of any serious risk of harm to his health during this alleged encounter.   Further, Plaintiff does not describe how

22

long the period of delay was between allegedly asking Nurse Wells to get someone to help him and when another medical personnel checked in on him or that his condition worsened during this delay. Plaintiff has not put forth any evidence that Nurse Wells actually knew of any risk of serious harm to Plaintiff. See Walsh, 2012 WL 12952564, at *8 ("[T]he inquiry does not focus on serious medical needs that a defendant *should* have perceived but did not[,] rather that the official must have actually perceived the medical need." (citations and quotation marks omitted and alterations adopted)). Moreover, Plaintiff does not dispute the validity of Nurse Wells' entries in his medical records. Thus, even accepting as true Plaintiff's assertion that he told Nurse Wells about his pain on at least one occasion and that he asked her to get someone to help him, the Court does not find that there is a genuine issue of material fact as to whether Nurse Wells was deliberately indifferent.

For the same reasons, Plaintiff's claim against Ms. West fails. However, Ms. West is even less culpable than Nurse Wells because Ms. West does not have the same medical training as the nurses at ASMP. Ms. West is a Certified Nursing Assistant ("CNA"). (West Decl., Doc. 77-6, ¶ 3.) As a CNA, her duties "consisted primarily of assisting with the basic needs of inmates, such as clothing, feeding, and bathing, taking and documenting vital signs, emptying bed pans, and changing bed linens." (Id. ¶ 4.)

She is not involved in the "examination, diagnosis, or treatment of patients," she does not "prescribe, administer, or otherwise deal with any medications, and [her] duties d[o] not require or involve consulting inmate medical histories or charts or discussing medical issues or concerns with inmates." (Id.) However, Plaintiff argues that because Ms. West had "ready access to . . . knowledge" of his underlying conditions and the risks associated with, there exists a question of fact as to whether her failure to suggest an alternative treatment plan or that Plaintiff should be referred to a specialist to her superiors constitutes deliberate indifference. (Doc. 79, at 15.)

Ms. West was not in the position to diagnosis or treat Plaintiff and she reasonably relied on the nurses and doctors to do so. At most, Plaintiff has shown that Ms. West should have known that he was exhibiting symptoms of ischemia by expressing his pain. However, as the Court has repeatedly explained, that is insufficient to support a claim of deliberate indifference. See Jenkins v. Corizon Health Inc., No. CV418-099, 2020 WL 5269405, at *10 (S.D. Ga. Sept. 3, 2020) ("'An official's failure to alleviate a significant risk that he should have perceived but did not' is insufficient to establish a constitutional violation." (quoting Collins v. Bates, No. 17-14559-G, 2018 WL 5090845, at *5 (11th Cir. May 10, 2018) (alterations adopted)).

Plaintiff has not satisfied the onerous burden of proving the deliberate indifference of Nurse Wells and Ms. West.  <u>See</u> <u>Whitehead</u>, 403 F. App'x at 403 ("The plaintiff shoulders a heavy burden . . . ."). Therefore, Nurse Wells and Ms. West are entitled to summary judgment on Plaintiff's claims of deliberate indifference.

v. Warden Shepard & Deputy Warden McGrew

Plaintiff also asserts claims of deliberate indifference against Warden Shepard and Deputy Warden McGrew, who were not involved in Plaintiff's medical treatment.  "An Eighth Amendment 'medical treatment claim [will] not lie against non-medical personnel unless they were personally involved in the denial of treatment or deliberately interfered with prison doctors' treatment.  Prison officials are entitled to rely on the opinions, judgment and expertise of a prison medical staff to determine a medically necessary and appropriate cause of treatment for an inmate.'"  <u>Truschke v. Chaney</u>, No. 5:17-CV-93, 2018 WL 814579, at *5 (S.D. Ga. Feb. 9, 2018), *report and recommendation adopted*, 2018 WL 1513354 (S.D. Ga. Mar. 27, 2018) (quoting <u>Baker v.</u> <u>Pavlakovic</u>, No. 4:12-CV-03958, 2015 WL 4756295, at *7 (N.D. Ala. Aug. 11, 2015)).  Here, Plaintiff does not allege that Warden Shepard and Deputy Warden McGrew interfered with his treatment. Instead, Plaintiff argues they were aware of his pain and medical history and failed to do more.

25

Plaintiff asserts Deputy Warden McGrew "knew of [his] diabetes" and he "apprised [her] of the condition of [his] leg" and thus she "was required to do more tha[n] simply brush aside [his] pleas." (Doc. 79, at 17.) The only evidence Plaintiff cites to is his own testimony that Warden McGrew "has known about [his] diabetes for several years due to several conversations [they] had while [he] was an orderly at ASMP and [she] was also aware [he] was taking Plavix." (Hardy Decl., ¶ 9.) Additionally, Plaintiff contends he "showed her [his] leg and . . . foot when she came through for inspection" and she did nothing. (Hardy Dep., at 17.) Plaintiff essentially argues that because "he told [Deputy Warden McGrew] he was a diabetic on at least one occasion," she should have "consulted with Plaintiff's care providers" when he advised her of his right foot and leg pain. (Doc. 79, at 17; Doc. 82, at 17.) Plaintiff's claims against Warden Shepard are similar. He avers he told Warden Shepard about his pain "on at least one occasion" and he had access to his medical history. (Hardy Decl., ¶ 20; Doc. 79, at 2.) Also, Warden Shepard "often entered certain inmates' cells on occasion." (Doc. 82, at 31.)

Even taking Plaintiff's allegations as true, they do not support an inference of liability. First, as the Court has already noted, the mere knowledge of Plaintiff's medical history is not enough. A defendant must have actual knowledge of a risk of serious harm and disregard that risk. Here, Plaintiff was being

seen daily by ASMP medical staff and Plaintiff does not suggest otherwise.  Based on the evidence, it would not have been apparent to Deputy Warden McGrew or Warden Shepard that Plaintiff was receiving inadequate care.  See Truschke, 2018 WL 814579, at *5 ("[It] is widely held that non-medical prison personnel are generally entitled to rely on the expertise of the medical staff and are not required to second-guess the medical staff's judgment regarding an inmate's care." (quoting Stallworth v. Graham, No. 4:14-CV-00134, 2015 WL 4756348, at *5 (N.D. Ala. Aug. 11, 2015)); Johnson v. Doughty, 433 F.3d 1001, 1011 (7th Cir. 2006) ("Except in the unusual case where it would be evident to a layperson that a prisoner is receiving inadequate or inappropriate treatment, prison officials may reasonably rely on the judgment of medical professionals[.]"); Kelly v. Ambroski, 97 F. Supp. 3d 1320, 1343 (N.D. Ala. 2015) ("[I]n the absence of a reason to believe, or actual knowledge, that medical staff is administering inadequate medical care, non-medical prison personnel are not chargeable with the Eighth Amendment scienter requirement of deliberate indifference[.]").

Plaintiff has not put forth evidence that Deputy Warden McGrew or Warden Shepard had any knowledge that he was receiving allegedly inadequate care.  Instead, he argues that because they entered his cell and had an opportunity to observe his "deteriorating condition first-hand," his need for treatment would have been obvious.  (Doc.

79, at 17.) However, Plaintiff presents no evidence that anything was visibly wrong with his leg that would have put Deputy Warden McGrew and Warden Shepard on notice of his serious medical condition or that by telling them he was in pain, they actual knew of his deteriorating condition. See Powell v. Scott, No. CV412-004, 2013 WL 4039385, at *8 (S.D. Ga. Aug. 7, 2013), *report and recommendation adopted*, 2013 WL 4511358 (S.D. Ga. Aug. 23, 2013) ("Where . . . the defendant is not a trained medical professional, the need for immediate medical assistance must have been apparent to the untrained eye of a lay person." (internal quotation marks and citation omitted)). Without any knowledge that an intervention is necessary to avoid a constitutional violation, they did not have any duty to intervene. See Kelly, 97 F. Supp. 3d at 1343 ("Prison officials are not under a duty to directly supervise medical personnel or to intervene in treatment decisions where they have no actual knowledge that intervention is necessary to prevent a constitutional deprivation." (citations omitted)).

Lastly, Plaintiff asserts on one occasion Warden Shepard told him "if you make one more scream or outburst on this unit, I'm gonna put you behind the wall in 6A." (Hardy Dep., at 18; Hardy Decl., ¶ 20.) This comment does not change the Court's analysis, especially given Plaintiff's apparently frequent outbursts unrelated to his leg and foot pain. (See, e.g., ASMP Medical Records, at 11, 17, 23, 28.) Therefore, Warden Shepard and Deputy

28

Warden McGrew are entitled to summary judgment on Plaintiff's direct liability claims of deliberate indifference.

      b. *Supervisory Liability*

Plaintiff also attempts to hold Dr. Fountain, Warden Shepard, and Deputy Warden McGrew responsible for the alleged misconduct of their subordinates.

It is well established in the Eleventh Circuit that "supervisory officials are not liable under [Section] 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999) (internal quotation marks and citation omitted). To impose supervisory liability for Section 1983 violations, a plaintiff must demonstrate that either (1) "the supervisor personally participate[d] in the alleged unconstitutional conduct" or (2) "there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation." Cottone, 326 F.3d at 1360. This standard is "extremely rigorous." Braddy v. Fla. Dep't of Labor & Emp. Sec., 133 F.3d 797, 802 (11th Cir. 1998) ("The standard by which a supervisor is held liable in her individual capacity for the actions of a subordinate is extremely rigorous.").

First, Plaintiff's supervisory claim against Dr. Fountain fails because the Court has determined there is no evidence to establish a constitutional violation by her subordinates. Without

an underlying constitutional violation, Plaintiff cannot maintain a Section 1983 action for supervisory liability. See Mann, 588 F.3d at 1308 ("Plaintiffs' claims under a theory of supervisory liability fail because the underlying [Section] 1983 claims fail." (citing Hicks v. Moore, 422 F.3d 1246, 1253 (11th Cir. 2005))).

Plaintiff has no claims for supervisory liability against Warden Shepard and Deputy Warden McGrew either. The Court previously determined Plaintiff failed to assert facts that Warden Shepard and Deputy Warden McGrew personally participated in decisions regarding his treatment. (Doc. 53, at 23.) Thus, Plaintiff must establish a causal connection between the wardens' actions and the constitutional violation. The necessary causal connection may be established by showing: (1) "a history of widespread abuse put[] the responsible supervisor on notice of the need to correct the alleged [constitutional] deprivation, and he fail[ed] to do so"; (2) "a supervisor's custom or policy result[ed] in deliberate indifference to constitutional rights"; or (3) "facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." Cottone, 326 F.3d at 1360 (internal quotation marks omitted) (quoting Gonzalez v. Reno, 325 F. 3d 1228, 1234-35 (11th Cir. 2003)). The Court previously determined Plaintiff did not allege a history of widespread abuse in his Complaint and failed to plead sufficient

facts to support his assertion that a custom or policy resulted in deliberate indifference. (See Doc. 53, at 24.) Therefore, Plaintiff must put forth evidence to support a causal connection under the third prong.

Plaintiff argues that "in the event that either [Warden] Shepard or [Deputy Warden] McGrew were made aware of [his] condition only to later discover that his condition never improved, such a circumstance would have placed them on notice that their respective subordinates were not providing proper care." (Doc. 82, at 32-33.) However, Plaintiff has not alleged that Warden Shepard and Deputy Warden McGrew directed the ASMP medical staff to withhold care or to act unlawfully. Further, there is no evidence that they had any knowledge of Dr. Fountain's alleged unconstitutional conduct.

Plaintiff offers no evidence to support his allegations that Warden Shepard and Deputy Warden McGrew knew Dr. Fountain would act unlawfully and failed to stop her, and his conclusory allegations are insufficient to meet the "extremely rigorous" standard necessary to impose supervisory liability. See Braddy, 133 F.3d at 802. Thus, Dr. Fountain, Warden Shepard, and Deputy Warden McGrew are entitled to summary judgment on Plaintiff's supervisory liability claims.

## B. Qualified Immunity

Because there remains a Section 1983 claim for deliberate indifferent against Dr. Fountain, the Court now considers whether she is entitled to qualified immunity.

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Grider v. City of Auburn, 618 F.3d 1240, 1254 (11th Cir. 2010) (quoting Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002)) (alterations adopted and internal quotation marks omitted). "Qualified immunity from suit is intended to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." Id. (citation and internal quotation marks omitted). In other words, "[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." Robinson v. Payton, 791 F.3d 824, 829 (8th Cir. 2015) (citing Davis v. Hall, 375 F.3d 703, 712 (8th Cir. 2004)).

"To receive qualified immunity, the government official must first prove that he was acting within his discretionary authority." Gonzalez, 325 F.3d at 1234 (citing Vinyard, 311 F.3d at 1346). To determine whether a government official was acting within the scope

of his discretionary authority, courts consider whether the official "(a) perform[ed] a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir. 2004) (citation omitted). Here, there is no question that Dr. Fountain was acting within the scope of her discretionary authority at all relevant times.

"Once the defendants establish that they were acting within their discretionary authority, the burden shifts to the plaintiff to demonstrate that qualified immunity is not appropriate." Gray ex rel. Alexander v. Bostic, 458 F.3d 1295, 1303 (11th Cir. 2006) (quoting Lumley v. City of Dade City, 327 F.3d 1186, 1194 (11th Cir. 2003)). Accordingly, the Court must turn to the evidence to determine whether Plaintiff can demonstrate that Dr. Fountain is not entitled to qualified immunity. See Bowen v. Warden Baldwin State Prison, 826 F.3d 1312, 1319 (11th Cir. 2016). To overcome a qualified immunity defense, a plaintiff "must show that: (1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." Moreno v. Turner, 572 F. App'x 852, 855 (11th Cir. 2014) (citing Whittier v. Kobayashi, 581 F.3d 1304, 1308 (11th Cir. 2009)).[10]

---

[10] The Court may consider these issues in any order. See Pearson v. Callahan, 555 U.S. 223, 236 (2009) ("The judges of the district courts . . . should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

"'Clearly established law' is law that is sufficiently established so as to provide public officials with 'fair notice' that the conduct alleged is prohibited." Randall, 610 F.3d at 715 (citing Hope, 536 U.S. at 739).   The Eleventh Circuit has articulated three ways in which a law can be clearly established. "First, the words of the pertinent federal statute or federal constitutional provision in some cases will be specific enough to establish clearly the law applicable to particular conduct and circumstances and to overcome qualified immunity, even in the total absence of case law." Vinyard, 311 F.3d at 1350.  This means "the conduct 'so obviously violates the Constitution that prior case law is unnecessary.'"   Hudson v. City of Riviera Beach, No. 12-80870-CIV, 2014 WL 1877412, at *13 (S.D. Fla. May 9, 2014). Second, "some broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts." Vinyard, 311 F.3d at 1351.  "The third and final way for a right to become clearly established is 'by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose.'"   Joseph v. Bd. of Regents of Univ. Sys. of Ga., No. 1:20-CV-502, 2020 WL 6494202, at *13 (N.D. Ga. May 8, 2020) (citing Jenkins by Hall v. Talladega City Bd. of Educ., 115 F.3d 821, 826 n.4 (11th Cir. 1997)).

The Court determined a reasonable jury could find Dr. Fountain violated a constitutional right. Therefore, as long as that right is clearly established, Dr. Fountain is not entitled to qualified immunity at this time. "A core principle of Eighth Amendment jurisprudence in the area of medical care is that prison officials with knowledge of the need for care may not, by failing to provide care, delaying care, or providing grossly inadequate care, cause a prisoner to needlessly suffer the pain resulting from his . . . illness." McElligott, 182 F.3d at 1257. Additionally, the Eleventh Circuit has "recognized that prison officials may violate the Eighth Amendment's commands by failing to treat an inmate's pain." Id.

Plaintiff asserts the facts in Mandel v. Doe, 888 F.2d 783, 785 (11th Cir. 1989) put Dr. Fountain on notice that her conduct was unconstitutional. In Mandel, the plaintiff sought medical treatment after jumping off the bed of a work crew pick-up truck and immediately feeling "a sharp pain in his left leg and hip." 888 F.2d at 785. The plaintiff complained of pain for at least two months and requested to see a doctor or be sent to the hospital for an x-ray of his leg on multiple occasions. Id. The defendant, who was a physician's assistant, denied the plaintiff's requests, diagnosed his condition as muscle inflammation, and prescribed him aspirin and muscle relaxants. Id. at 786. The plaintiff's symptoms continued to worsen over time and by the time he was

released from the county road prison he could no longer walk.  Id.
After his release, he was examined by an orthopedic surgeon who
determined he sustained a fracture in his hip joint.  Id. at 787.
The delay in treatment caused the fracture to turn into "a collapse
of the roundness of the bone and made necessary a complete
prosthetic hip joint replacement . . . ."  Id.  The Eleventh
Circuit found the defendant's

> persistent refusal to order an X-ray, or to refer [the
> plaintiff] to a doctor or a hospital for more experienced
> and knowledgeable treatment, coupled with his utter lack
> of concern for the well-being of an inmate with whose
> care he had been entrusted, constitutes precisely the
> deliberate indifference not tolerated by the
> Constitution.

Id. at 790.  The facts do not have to be identical to clearly
establish a right.  See Melton, 841 at 1227-28 (citing Mercado v.
City of Orlando, 407 F.3d 1152, 1159 (11th Cir. 2005)).  The Court
agrees that the facts in Mandel and the other cases it has cited
in its decision are sufficiently similar to put Dr. Fountain on
notice that her actions were unconstitutional.  Therefore, Dr.
Fountain is not entitled to qualified immunity.

## IV. CONCLUSION

For the reasons stated above, Defendants' motion for summary
judgment is **GRANTED IN PART** and **DENIED IN PART**.  In particular,
Defendants' motion is **GRANTED** as to Plaintiff's Section 1983 claim
against Nurse Giddens, Nurse Wells, Ms. West, Warden Shepard, and

36

Deputy Warden McGrew and **DENIED** as to Plaintiff's Section 1983 claim against Dr. Fountain for direct liability.  The Clerk is directed to **ENTER JUDGMENT** in favor of Nurse Giddens, Nurse Wells, Ms. West, Warden Shepard, and Deputy Warden McGrew.  Accordingly, this case shall proceed to trial as to Plaintiff's Section 1983 claim against Dr. Fountain and Plaintiff's state law claims against the Georgia Department of Corrections and the Board of Regents of the University System of Georgia.

    **ORDER ENTERED** at Augusta, Georgia, this 13th day of August, 2021.

                              J. RANDAL HALL, CHIEF JUDGE
                              UNITED STATES DISTRICT COURT
                              SOUTHERN DISTRICT OF GEORGIA